UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

FRAZIER CLARK                                                                        Plaintiff

v.                                                             Civil Action No. 3:18-CV-P257-RGJ

CORRECT CARE SOLUTIONS, LLC                                              Defendant

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion for summary judgment filed by Defendant Correct Care Solutions, LLC (CCS)[1] (DN 40).  Proceeding *pro se*,[2] Plaintiff filed a document docketed as a motion for summary judgment, which the Court also construes as a response to CCS's motion (DN 52).  CCS filed a response to Plaintiff's motion for summary judgment, which the Court also construes as a reply (DN 53).  For the reasons that follow, CCS's motion for summary judgment will be granted.

### I.  SUMMARY OF RELEVANT FACTS

Plaintiff was a convicted inmate at the Kentucky State Reformatory (KSR) at the time of the events alleged in the complaint and amended complaint and was subsequently transferred to the Luther Luckett Correctional Complex (LLCC).  Upon initial review of the amended complaint pursuant to 28 U.S.C. § 1915A, the Court allowed Plaintiff's Eighth Amendment claim for deliberate indifference to his serious medical needs to proceed against CCS, the medical provider at KSR.

---

[1] In its motion for summary judgment, CCS states that it has changed its name to WellPath, LLC.  The Court, however, will continue to refer to this Defendant as CCS herein.

[2] Plaintiff filed the complaint and amended complaint by counsel.  Counsel later filed a motion to withdraw (DN 29), which the Court granted (DN 30).  Plaintiff has since then proceed *pro se* in this action.

In the amended complaint, filed on May 8, 2018, Plaintiff alleged that he suffers from Sickle Cell Anemia, which required him "to have a blood transfusion ever four weeks to avoid very serious side effects, including possible strokes or death."  (DN 7, ¶¶ 11-12).  Plaintiff reported that he received blood transfusions outside the prison at Norton Hospital.  (*Id.*, ¶ 14). He alleged, "As the four-week mark draws near, Mr. Clark begins to experience extreme fatigue and pain until he receives his blood transfusion."  (*Id.*, ¶ 15).  Plaintiff alleged that Defendant "routinely failed or refused to transport Mr. Clark to Norton Hospital at his scheduled four-week interval for his needed blood transfusion[]" despite Norton Hospital sending "reminder notices" of needed appointments.  (*Id.*, ¶¶ 16-17).  Plaintiff alleged, "On one occasion, Defendants withheld Mr. Clark's transfusion appointment for six weeks, which resulted in him being in such poor condition by the time he was taken to Norton Hospital that he was admitted to the emergency room for seven days."  (*Id.*, ¶ 18).  He reported, "At that time, Mr. Clark filed a grievance, which resulted in the appointment of one individual to ensure that Mr. Clark received his transfusions on the required four-week schedule."  (*Id.*, ¶ 19).

According to the amended complaint, "[s]oon thereafter, on January 4, 2018, Mr. Clark had an infusion and was discharged with an instruction to Defendants to have Mr. Clark return in four weeks."  (*Id.*, ¶ 20).  Plaintiff stated that five weeks passed without being taken for another infusion and the he went to the medical department "on multiple occasions to question why he was not getting to go to appointment and advising them of his severe pain."  (*Id.*, ¶ 21).  He alleged, "Nevertheless, Defendants did not take Mr. Clark to get his infusion until March 5, 2018, two full months after his previous infusion."  (*Id.*, ¶ 22).  He stated, "During that time, Mr. Clark had difficulty moving, could not sleep, and was in such severe pain that he believed he was dying."  (*Id.*, ¶ 23).  Plaintiff asserted, "By the time Defendants took Mr. Clark for his infusion

on March 5, 2018, Mr. Clark's blood levels were so low that he had a negative reaction to the infusion, resulting in stroke-like symptoms and admission to the Intensive Care Unit for ten days where he was placed on oxygen." (*Id.*, ¶ 24).[3]

In its motion for summary judgment, CCS argues that the undisputed facts establish that Plaintiff did not suffer a violation of his Eighth Amendment rights and that any purported delay in medical treatment was not caused by a custom or policy of CCS. CCS attaches its deposition of Plaintiff and Plaintiff's pertinent medical and grievance records to its motion.

In his deposition, Plaintiff testified that he is twenty-four years old and has been incarcerated since September 2016. (DN 40-1, p. 7). CCS maintains that Plaintiff testified that, while in the custody of the Kentucky Department of Corrections (KDOC), he had missed three transfusion appointments—January, 2017; February, 2017; and September, 2018. (*Id.*, pp. 23, 25, 78). Plaintiff testified that on one of those occasions, in September 2018, he refused the treatment after a corrections officer refused to let him eat before the appointment. (*Id.*, pp. 15, 78).

Therefore, CCS maintains, other than the appointment in September 2018 in which Plaintiff admittedly refused treatment, the other two missed appointments in January and February 2017 occurred in the first two months of his custody in the KDOC. (*Id.*, pp. 24, 25). With regard to these appointments, Plaintiff testified that he was unaware of there having been any other inmates for whom monthly transportation services were required due to blood transfusion treatments. (*Id.*, p. 21). He further testified that he was not aware of any evidence to

---

[3] Plaintiff also alleges in the amended complaint that he had been prescribed narcotic pain medication by Norton Hospital but that "Defendants [had] stated their intention to discontinue his narcotic pain medication[]" and had given Plaintiff lower dosages than the amount prescribed. (*Id.*, ¶¶ 26, 30). However, in his deposition, Plaintiff testified that he was not asserting a claim based on not receiving pain medication. (DN 14-1, p. 31-32). Therefore, the Court does not consider the allegations related to pain medication as asserting a separate Eighth Amendment claim against CCS and will not address these allegations.

suggest that anyone affiliated with CCS deliberately or intentionally prevented him from receiving his transfusions on those two occasions or the identity of who was responsible for the scheduling problems on those two occasions.  (*Id.*, pp. 23, 25).  Plaintiff also testified that he was not aware of any policy or custom of CCS that resulted in the missed appointments.  (*Id.*, p. 35).

Moreover, CCS argues that Plaintiff testified that, at the time of his deposition, after the first two missed appointments, he had been transported to an outside facility for transfusion appointments on approximately 36 occasions, with roughly 12 of those appointments occurring after his transfer to LLCC in November 2018.  (*Id.*, pp. 18-19).  When asked if there had been any problems with his transfusion appointments since his transfer to LLCC, Plaintiff said no. (*Id.*, p. 18).  Moreover, CCS asserts that when he was asked specifically about why he thought the January and February 2017 appointments were missed, Plaintiff testified that he did not know, but that he was told by an unnamed nurse that the appointments were missed because someone "forgot to schedule it."  (*Id.*, p. 22).

The following is a description of Plaintiff's pertinent medical records that were attached to CCS's motion.

Plaintiff was seen by intake at KSR on February 8, 2017,[4] when he transferred into the facility.  (DN 42, pp. 57-58).[5]  A History and Physical was performed the following day, on February 9, 2017, noting Plaintiff's diagnosis of Sickle Cell Anemia and his self-reported transfusion schedule of once every three weeks.  The provider's note, prepared by Dr. Thad Manning, also documented the need to follow-up with Dr. Kemen "concerning transfusion site." (*Id.*, pp. 53-54).

---

[4] In his deposition, Plaintiff stated that he transferred from the Bourbon County Jail to KSR on February 8, 2017. (DN 40-1, p. 70).

[5] While CCS attaches Plaintiff's medical records to its motion for summary judgment as Exhibits 3, 4, and 7, it filed the medical records under seal in separate docket entries (DNs 42, 43, and 44).  The Court will cite the separate docket entries and page number in each docket entry, rather than the Bates stamp page number used by CCS, for ease of reference.

On February 16, 2017, APRN Janice Garth transmitted a "Consultation Request and Hospital Transfer Form" to Norton Healthcare for Plaintiff to be seen by Hematology/Oncology relating to his Sickle Cell Anemia.  (DN 43, p. 40).  A medical note dated February 20, 2017, shows that Plaintiff was approved for the referral, and medical staff at the prison was "[a]waiting schedule date."  (DN 42, p. 45).  Also on February 20, 2017, Plaintiff "presented to the chemo room" at KSR "to have his labs drawn."  (*Id.*, p. 47).  On February 27, 2017, Plaintiff's oncology labs were drawn in advance of his anticipated transfusion.  (*Id.*, p. 42).

On March 11, 2017, Plaintiff was seen for his complaints of pain related to his condition. (*Id.*, p. 65).  Tylenol 3 was ordered for pain management.  That note also documented a "missed scheduled appt. in Feb (unsure reason why)."  (*Id.*)  The note also documented the need to follow-up with Norton Oncology for evaluation/treatment plan.  (*Id.*)

Plaintiff received a transfusion on March 14, 2017, at Norton Cancer Institute.  (*Id.*, pp. 35-37, 63).  It was noted that "at the time of initial presentation was incarcerated, and had been 6 weeks since his last previous procedure."  (*Id.*, p. 35).  It was documented that he "had suffered with a generalized pain crisis continuing over the previous week, having been treated with IV fluids last week, the pain being ameliorated but not relieved."  (*Id.*)  It was also noted in the Instructions section that Plaintiff should "[r]eturn in about 3 weeks (around 4/4/2017)."  (*Id.*, p. 37).

Plaintiff next received a transfusion on April 18, 2017.  (*Id.*, p. 61).  He was also sent to an outside provider on April 17 and on April 19, 2017, related to receiving treatment for his condition.  (*Id.*, p. 62; DN 43, pp. 43-45, 49-56).  On April 19, 2017, Plaintiff "denie[d] any change in symptoms related to sickle-cell disease over the last month," and he further indicated that he did "not have any chronic pain."  (DN 43, p. 52).

On May 22, 2017, a Norton Cancer staff member, Jonika Hickerson, contacted staff at KSR regarding the fact that Plaintiff missed his appointment that day. According to the medical records, the KSR staff person who spoke with Hickerson "stated that she was unaware that he had an appt today . . . [and that] she will call me as soon as she is able to get [Plaintiff] approved to come back in." (*Id.*, p. 57).

On June 8, 2017, Hickerson spoke with "Janice [Garth] at KSR and informed her that [Plaintiff] has 2 appt's that he will need to have transportation arrangements made. . . . She verbalized understanding and states she will make sure this is taken care of." (*Id.*, p. 63). The appointments were scheduled for June 30, 2017, and July 3, 2017. (*Id.*)

On June 9, 2017, Garth transmitted the Consultation Request and Hospital Transfer Forms to Norton for the June 30, 2017, and July 3, 2017, appointments, the latter of which would be an "8 hour procedure" for the transfusion. (*Id.*, pp. 41, 11).

Plaintiff was taken to the outside provider for the June 30, 2017, appointment (DN 42, p. 39), and he was again transported on July 3, 2017, for the transfusion procedure. (DN 43, pp. 2-10).

Plaintiff received the next transfusion procedure on August 14, 2017. (*Id.*, pp. 12-19). At that time, Plaintiff "denie[d] any change in symptoms related to sickle-cell disease over the past month," but did report having "chronic low b[]ack pain." (*Id.*, p. 15).

On September 15, 2017, Norton employee Hickerson called and left a voicemail at KSR "informing them of Dr. K and OMO appt in October." (*Id.*, p. 20).

On September 26, 2017, Plaintiff requested that his pain medication be renewed, which was transmitted to the provider for approval. (DN 42, p. 38).

On October 6, 2017, Plaintiff reported severe pain, shortness of breath, and fatigue. (DN 43, p. 54). The medical note stated that Plaintiff "missed last months transfusion." (*Id.*) Plaintiff was transported to the Norton Hospital Emergency Room. (*Id.*; DN 44, pp. 2-6). Plaintiff reported that he felt like it was "a typical flare up" of his Sickle Cell condition, and "denie[d] having been sick recently stating 'he just hasn't had his normal transfusion in a while.'" (DN 44, pp.14-15). Plaintiff was then admitted to the hospital and received a transfusion on October 10, 2017. (DN 43, pp. 21-33). Plaintiff was discharged from the hospital back to the prison on October 13, 2017. (DN 42, p. 68).

Plaintiff thereafter received transfusions on December 5, 2017 (*id.*, p. 41); January 4, 2018 (*id.*, p. 40); and March 5, 2018. (*Id.*, pp. 2-5).

Plaintiff was hospitalized from March 5, 2018, to March 15, 2018. The medical record states that he was admitted to Norton Hospital for "sickle cell pain crisis, with severe pain all over his body, in its usual distribution." (*Id.*, p. 9). It was noted, "He had missed an exchange in February due to being incarcerated." (*Id.*) He then received a transfusion on March 27, 2018. (*Id.*)

Plaintiff received transfusions on April 24, 2018 (*id.*, p. 17); May 22, 2018 (*id.*, pp. 18-25); June 19, 2018 (*id.*, pp. 26-32); July 17, 2018 (*id.*, p. 34); October 9, 2018 (*id.*, p. 16); and November 6, 2018. (DN 43, p. 34-39).

Plaintiff did not receive a transfusion as scheduled on September 11, 2018, because he refused to be transported after, according to Plaintiff's deposition, KSR staff did not allow him to eat prior to being transported. (DN 40-1, pp. 79-80).

CCS also points to Plaintiff's grievance records related to Plaintiff's claims. On October 16, 2017, Plaintiff submitted Grievance No. 17-1156 in which he grieved that his

medical appointments "are either not being kept or not being made which is resulting to me going through unnecessary pain." (DN 40-5, pp. 6, 11). He alleged in that grievance that a missed appointment made him "real sick," and required that he "had to be admitted to the E.R." where he stayed "for a week." (*Id.*) He requested that his appointments be "made and kept on time so that I have no future situations like I just had." (*Id.*) He did not identify any particular individual or entity in that grievance as the purportedly responsible party. The informal resolution to that grievance was for the oncology provider—Janice Garth—to "follow his hematology consult needs to ensure transfusions scheduled regularly without interruption." (*Id.*, p. 6.). Plaintiff appealed that informal resolution to the Healthcare Grievance Committee, and the Committee, on December 8, 2017, concurred with the informal resolution and noted that Plaintiff had been out for treatment since he filed his grievance and that Garth was now "following you to make sure that you are seen as needed." (*Id.*, p. 8). Plaintiff appealed that decision to the Medical Director who, on January 3, 2018, concurred with the Healthcare Committee's decision. (*Id.*, p. 10).

Plaintiff filed a document with the caption "RE: SUMMARY JUDGEMENT." It was docketed as a motion for summary judgment. The Court construes it as both a motion and a response to CCS's motion. Plaintiff states that at his deposition "the defense tried to claim since I have moved to a new [f]acility (Luther Luckett Correction) that all my appointments have been getting scheduled on time." (DN 52, p. 1). He states, "That is a lie. Since I have been at this facility I have been rushed to the hospital twice for more than 12 days each time." (*Id.*) Plaintiff states that he was taken to the hospital on April 13, 2020, and again on October 17, 2020. He asserts that both times he was placed at higher risk for COVID-19 and had to be quarantined for fourteen days upon his return. Plaintiff states, "The defense has been causing me grief, me[n]tal

anguish, stress and physical pain.  Over the course of my sentence I have been stressed out and worried when it comes to my medical appointments for w[h]ich I absolutely have no choice but to go." (*Id.*, p. 2).  Plaintiff maintains that CCS is "completely negl[i]gent to my medical history and needs." (*Id.*)  He states that he seeks punitive damages "to compensate for the de[fe]nse's intentional negl[i]gence, knowing and having it on file [] for my medical treatment!" (*Id.*)

Plaintiff submitted no medical records, grievance records, or other documents in support of or in opposition to summary judgment.

CCS filed a response to Plaintiff's motion for summary judgment, which the Court will also construe as a reply to Plaintiff's response.  CCS largely reiterates the arguments in its summary-judgment motion.  It also argues that Plaintiff's new allegations concerning hospital stays in April and October are "beyond the scope of the Court's pretrial discovery deadline and not part of the claims set forth in his amended complaint." (DN 53, p. 1).  CCS also asserts that the allegations are unsworn and not supported by certified medical records.  It argues that for these reasons the Court should not consider the allegations in ruling on the motion for summary judgment.

## II.  LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he has the burden of proof.  *Id.*  Once the moving party demonstrates this lack of evidence, the burden

passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id.* If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Where the nonmoving party bears the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F. Supp. 214, 217 (E.D. Mich. 1990). If the non-moving party fails to do so, the moving party is "entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id.* (internal quotation marks omitted).

## III. ANALYSIS

### A. Deliberate indifference

To establish an Eighth Amendment violation premised on inadequate medical care, a prisoner must demonstrate that the defendant acted, or failed to act, with "deliberate indifference to serious medical needs." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002). A claim of deliberate indifference under the Eighth Amendment has both an objective and a subjective component. The objective component requires the existence of a sufficiently serious medical need. *Turner v. City of Taylor*, 412 F.3d 629, 646 (6th Cir.

2005).  To satisfy the subjective component, the defendant must possess a "sufficiently culpable state of mind," rising above negligence or even gross negligence and being "tantamount to intent to punish." *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994).  Put another way, "[a] prison official acts with deliberate indifference if he knows of a substantial risk to an inmate's health, yet recklessly disregards the risk by failing to take reasonable measures to abate it." *Taylor v. Boot*, 58 F. App'x 125, 126 (6th Cir. 2003) (citing *Farmer*, 511 U.S. at 837-47).  Less flagrant conduct, however, may still evince deliberate indifference where there is "a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment." *Terrance*, 286 F.3d at 843 (citing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).  Such grossly inadequate care is "medical treatment 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id*. at 844 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).  "Deliberate indifference is the reckless disregard of a substantial risk of serious harm; mere negligence, or even gross negligence, will not suffice." *Wright v. Taylor*, 79 F. App'x 829, 831 (6th Cir. 2003) (citing *Farmer*, 511 U.S. at 835-36; *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)).

Moreover, the standard applied in reviewing the actions of prison doctors and medical staff in this type of case is deferential. *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).  Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are "generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  A court typically will not find deliberate indifference when some level of medical care has been offered to the inmate. *Christy v.*

*Robinson*, 216 F. Supp. 2d 398, 413-14 (D.N.J. 2002). Mere disagreement over medical treatment cannot give rise to a constitutional claim of deliberate indifference. *Durham v. Nu'Man*, 97 F.3d 862, 869 (6th Cir. 1996). Thus, a difference in medical judgment between an inmate and prison medical personnel regarding the appropriate diagnosis or treatment is not enough to state a deliberate indifference claim. *Ward v. Smith*, No. 95-6666, 1996 U.S. App. LEXIS 28322, at *2 (6th Cir. Oct. 29, 1996).

The parties do not dispute that Plaintiff's condition of having sickle cell anemia satisfies the objective component as a sufficiently serious medical need.

CCS argues that the facts establish that Plaintiff fails to meet the subjective component of a deliberate-indifference claim. It maintains that any isolated incidents in which there was a delay in Plaintiff receiving transfusion treatments "was due to the uniqueness of his condition within the prison setting, the logistics (both medical and security-related) that are associated with arranging for Plaintiff's transportation, and the frequency with which such transports must be accomplished." (DN 40, p. 14). CCS points to Plaintiff's deposition testimony that he was unaware of any other inmates for whom monthly transportation services were required due to blood transfusion treatments; any evidence suggesting that any CCS employee deliberately or intentionally prevented him from receiving a transfusion; the identity of anyone responsible for the scheduling problems; and any custom or policy that resulted in the missed appointments. CCS argues that, construing the facts in Plaintiff's favor, "the only explanation for any purported delays in Plaintiff's treatment was inadvertence, not deliberate indifference." (*Id.*)

CCS also asserts that Plaintiff testified in his deposition that "after the claimed missed appointments, he had been transported to an outside facility for transfusion appointments on

approximately 36 occasions, with roughly 12 of those appointments occurring after his transfer to LLCC." (*Id.*)  It argues that Plaintiff's medical records, construed in his favor, "establish that the missed appointments were either made (but inadvertently not kept) or went unscheduled due to miscommunication or inadvertence given the relative unfamiliarity with Plaintiff and his treatment regimen within the facility."  CCS argues, for these reasons, there is no genuine issue of material fact that support that the missed appointments were due to deliberate indifference, rather than inadvertence.

In addressing the subjective prong of Plaintiff's deliberate-indifference claim, the Court must first address some confusion concerning the timeline of events.  CCS argues that the only two missed appointments for transfusions occurred in January and February 2017 and emphasize that those two months were the first months he was incarcerated at KSR.  CCS bases this on Plaintiff's deposition testimony to this effect.  However, this assertion is not supported by the medical records.[6]  The medical records show that Plaintiff entered KSR on February 8, 2017, whereupon he underwent a medical intake screening.  (DN 42, pp. 57-58).  Therefore, any missed appointment in January of 2017 would not be the fault of CCS and, more importantly, is not alleged as basis for a claim in the amended complaint.

However, the problems with the timeline do not end there.  Based on the medical records submitted by CCS, after arriving at KSR on February 8, 2017, Plaintiff received transfusions on March 14, 2017, and April 18, 2017 (DN 42, pp. 35-37, 61).  At his March 14, 2017, transfusion, it was documented that Plaintiff "had suffered with a generalized pain crisis continuing over the previous week, having been treated with IV fluids last week, the pain being ameliorated but not relieved."  (*Id.*, p. 35).

---

[6] The Court notes that when Plaintiff was asked by his then counsel if he would "defer to the medical records on what dates things were supposed to happen or did happen or didn't happen[,]" Plaintiff responded in the affirmative. (DN 40-1, p. 83).

After Plaintiff received a transfusion in April 2017l, there is no medical record indicating that he received a transfusion in May 2017.  On May 22, 2017, a Norton Cancer staff member contacted KSR staff about Plaintiff's missed appointment that day.  (DN 43, p. 57).  The staff member called again on June 8, 2017, about scheduled appointments.  (*Id.*, p. 63).  The medical records show that Plaintiff did not receive his next transfusion until July 3, 2017.  (*Id.*, pp. 2-10).  He then received his next transfusion on August 14, 2017.  (*Id.*, pp. 12-19).

There is no medical record indicating that Plaintiff received a transfusion in September 2017.  On October 6, 2017, Plaintiff reported severe pain, shortness of breath, and fatigue.  (DN 43, p. 54).  The medical record stated that Plaintiff "missed last months transfusion."  (*Id.*)  Plaintiff was transported to the Norton Hospital Emergency Room.  (*Id.*; DN 44, pp. 2-6).  He reported that he felt like it was "a typical flare up" of his Sickle Cell condition, and denied being sick but stated that 'he just hasn't had his normal transfusion in a while.'"  (DN 44, pp.14-15).  Plaintiff was then admitted to the hospital and received a transfusion on October 10, 2017, and was not released until October 13, 2017.  (DN 43, pp. 21-33; DN 42, p. 68).

There is no medical record showing that Plaintiff received a transfusion in November 2017.  He received transfusions on December 5, 2017 (*id.*, p. 41), and January 4, 2018.  (*Id.*, p. 40).

There is no medical record indicating that Plaintiff received a transfusion in February 2018.  On March 5, 2018, he was admitted to Norton Hospital for "sickle cell pain crisis, with severe pain all over his body, in its usual distribution" and was released on March 15, 2018.  (*Id.*, p. 9).  It was noted, "He had missed an exchange in February due to being incarcerated."  (*Id.*)

The medical records show that Plaintiff received his next transfusion on March 27, 2018.  (*Id.*)  He thereafter received monthly transfusions through November 2018, with the exception of

September 2018, which both parties agree was due to the fact that Plaintiff refused treatment because he was not permitted by KSR staff to eat before being transported to the transfusion.

Therefore, the medical records produced by CCS, and not disputed by Plaintiff, show that Plaintiff was supposed to receive transfusions every 3 or 4 weeks.  However, contrary to CCS's assertion that he only missed transfusions in January and February 2017, Plaintiff missed transfusions in February 2017, May 2017, June 2017, September 2017, November 2017, and February 2018.  Of those missed appointments, two resulted in Plaintiff being hospitalized – from October 6 to 13, 2017, and from March 5 to 15, 2018.

With this timeline clarified, the Court turns to the subjective prong.  "Although the [] subjective standard 'is meant to prevent the constitutionalization of medical malpractice claims,' a plaintiff need not show that the officer acted with the specific intent to cause harm." *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 540 (6th Cir. 2008) (quoting *Comstock v. McCrary*, 273 F.3d 693, 703(6th Cir. 2001)).  Prison personnel "do not readily admit this subjective component, so 'it [is] permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge.'"  *Id.*  The subjective component can "be established simply by showing that the correctional officer 'refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'"  *Richko v. Wayne Cty., Mich.*, 819 F.3d 907, 918 (6th Cir. 2016) (quoting *Farmer*, 511 U.S. at 843 n. 8); *see also Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) (observing that "a factfinder may infer actual knowledge through circumstantial evidence, or may conclude a prison official knew of a substantial risk from the very fact that the risk was obvious") (internal citation and quotation marks omitted).

As the Sixth Circuit held in *Sours v. v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478 (6th

Cir. 2014):

> The question of whether an official actually perceived, inferred, or disregarded a
> risk is a question of fact for the jury "subject to demonstration in the usual ways,
> including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842;
> *Clark-Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006). Yet a court must
> also consider other factors—such as the obviousness of the risk, the information
> available to the official, the observable symptoms, and the expected level of
> knowledge of the particular official. *Farmer*, 511 U.S. at 842-43; *LeMarbe* [*v.
> Wisneski*,] 266 F.3d [429,] 436-39 [(6th Cir. 2001)]. If a risk is obvious or if it is
> well-documented and circumstances suggest that the official has been exposed to
> information such that she must have known of the risk, the evidence is sufficient
> for a jury to find that the official had knowledge. *Farmer*, 511 U.S. at 842-43.

*Sours*, 593 F. App'x at 484. In *Sours*, the Sixth Circuit reversed entry of summary judgment in

favor of a nurse finding that the record presented a genuine issue of material fact with respect to

the subjective prong of a deliberate-indifference claim. The court found, "While the district

court focused much of its analysis on Nurse Allison's statement of her knowledge, a court must

also consider other factors, including the obviousness of the risk." *Id.* (citing *Farmer*, 511 U.S.

at 842). Factors the Sixth Circuit found relevant included that the nurse:

> did nothing to obtain insulin for Sours or administer insulin to him, even though
> 1) Dr. Belhasen had previously prepared a sliding scale so that [the nurse] would
> be able to administer insulin to new inmates until they could establish regular
> maintenance; and 2) Allison knew that during her absence Sours would be
> without insulin for five days after not having any for at least the two previous
> days and likely longer.

*Id.* at 485-86.

Moreover, "[f]ailure by a jail medical staff to adhere to a prescribed course of treatment

may satisfy the subjective component of an Eighth Amendment violation." *Richmond v. Huq*,

885 F.3d 928, 939 (6th Cir. 2018). The Sixth Circuit has held that "a prisoner who suffers pain

needlessly when relief is readily available has a cause of action against those whose deliberate

indifference is the cause of his suffering." *Id.* (citing *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-

55 (6th Cir. 1991).  Further, the "interruption of a prescribed plan of treatment could constitute a constitutional violation."  *Id.* (citing *Boretti*, 930 F.2d at 1154).

In *Richmond*, the Sixth Circuit reversed entry of summary judgment in favor of a doctor finding a genuine issue of material fact concerning the subjective prong.  The court recognized that a disagreement over the adequacy and type of treatment is not sufficient and that courts must be deferential to medical judgments made by prison staff.  However, the court found that the doctor's failure to follow the inmate's plan of treatment created a genuine issue of material fact.  The Sixth Circuit stated as follows:

> The Defendants are correct that to the extent Richmond challenges the adequacy of her treatment, this Court is deferential to the judgments of medical professionals.  However, as noted above, Richmond also argues that Dr. Clafton "fail[ed] to provide the care that was ordered."  *See* Appellant Brief at 42.  As discussed, there is a question of fact whether Dr. Clafton viewed Richmond's chart.  A reasonable jury could find that Dr. Clafton reviewed or should have reviewed Richmond's chart, which would have made him aware of the risk that the Jail medical staff had and would continue to fail to adhere to his prescribed plan of care, and that he subsequently disregarded that risk by failing to ensure that his orders were implemented as prescribed.  This is especially true in light of Richmond's well-documented complaints.  Such a finding of the failure to provide the prescribed plan of treatment may form the basis of a claim for deliberate indifference to an inmate's serious medical needs.  *Boretti*, 930 F.2d at 1154.

*Richmond*, 885 F.3d at 940-41.

The instant case does not present a disagreement in medical judgment concerning Plaintiff's course treatment.  CCS does not dispute that Plaintiff required transfusions every three to four weeks to treat his sickle cell anemia or that missing a transfusion caused Plaintiff severe pain.  This case involves CCS's repeated failure to follow the plan for his treatment.  In March 2017, after Plaintiff missed his February treatment, the first month he was incarcerated in KSR, the medical record shows that it had been six weeks since Plaintiff's last transfusion and that he had suffered a "generalized pain crisis continuing over the previous week, having been treated

with IV fluids last week, the pain being ameliorated but not relieved." (DN 42, p. 35). However, only two months later, CCS failed to arrange a transfusion treatment for May, despite documented calls from Norton personnel regarding appointments. Plaintiff's next transfusion did not occur until July 3, 2017. Only two months later, in September 2017, CCS again failed to arrange Plaintiff's treatment, which resulted in Plaintiff's admission to the hospital from October 6 to 13, 2017. Plaintiff's medical records further show that he missed the following month's treatment, and after receiving treatments in December 2017 and January 2018, CCS again failed to arrange his treatment for February 2018, which caused him to be hospitalized from March 5 to 15, 2017.

All told, during the fourteen-month period from February 6, 2017, when he entered KSR, to March 2018, CCS failed to arrange transfusion appointment for Plaintiff in six of those months, despite his need for transfusion treatments and severe pain endured when he missed them being well-documented. The medical records show that CCS repeatedly failed to adhere to Plaintiff's treatment plan. For these reasons, the Court finds that CCS has failed to show an absence of a genuine issue of material fact as to the subjective prong of a deliberate indifference claim. Therefore, the Court will deny the motion for summary judgment on this basis.

**B. Corporate liability**

However, because CCS is a corporate entity, rather than an individual, Plaintiff must establish liability of the entity.[7] "[A] municipality cannot be held liable *solely* because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978). A municipality cannot be held responsible for a constitutional deprivation unless

---

[7] Plaintiff did not sue any individual medical provider, and he never sought leave to amend the complaint to add any such individual. Had he done so, Plaintiff would not have had to clear this hurdle and his case may have proceeded.

there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. *Id*. The Sixth Circuit has held that the same analysis that applies to a § 1983 claim against a municipality applies to a § 1983 claim against a private corporation, such as CCS. *See Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) ("*Monell* involved a municipal corporation, but every circuit to consider the issue has extended the holding to private corporations as well.") (citing *Monell*, 436 U.S. at 691).

Thus, liability of a municipality or a contracted private entity must be based on a policy or custom. *Id.*; *see also Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001). To state a claim, a plaintiff must "identify the policy, connect the policy to the [entity] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 363-64 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987), *overruled on other grounds by Frantz v. Vill. of Bradford*, 245 F.3d 869 (6th Cir. 2001)). The policy or custom "must be 'the moving force of the constitutional violation' in order to establish the liability of a government body [or entity] under § 1983." *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994) (quoting *Polk Cty. v. Dodson*, 454 U.S. 312, 326 (1981) (citation omitted)).

To properly assert a municipal or corporate custom or policy, a plaintiff must sufficiently allege: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision[-]making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). A corporate entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694.

In its motion, CCS argues that Plaintiff "has not established (nor could he) the existence of a custom or policy of Defendant to deny him transfusion treatments, and no reasonable factfinder could conclude that any such custom or policy exists." (DN 40, p. 16). It maintains, "the medical records (when construed in Plaintiff's favor) do not establish a policy or custom of denying or delaying Plaintiff's medical treatment; instead, they establish, at most, mere inadvertent delays in treatment in isolated instances." (*Id.*, pp. 16-17).

In his motion for summary judgment/response to CCS's motion, Plaintiff offers no argument or evidence to support corporate liability. Specifically, he has failed to identify an official policy, an official with decision-making authority who ratified any illegal actions, or the existence of a policy of inadequate training or supervision. To the extent Plaintiff may argue that a custom of tolerance of or acquiescence to a violation of federal rights existed, Plaintiff must allege: "(1) a clear and persistent pattern of misconduct, (2) notice or constructive notice on the part of the municipality, (3) the defendant's tacit approval of the misconduct, and (4) a direct causal link to the violations." *Nouri v. Cty. of Oakland*, 615 F. App'x 291, 296 (6th Cir. 2015) (internal quotation marks omitted); *see Burgess*, 735 F.3d at 478 ("A custom-of-tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims.").

While Plaintiff could point to his medical records to show that his problems with receiving his transfusions were reoccurring, without more, the Court cannot find that it is sufficient evidence of a custom. Plaintiff offers no evidence of any other inmate for whom CCS failed to arrange monthly treatments for sickle cell anemia or any other condition or any evidence that CCS or any employee with supervisory authority had any knowledge or gave tacit approval to the problems with arranging Plaintiff's transfusion. The standard for bringing a § 1983 claim against a municipality is a "high bar[,]" and "[a] *Monell* claim that survives

summary judgment is exceedingly rare." *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 541-42 (6th Cir. 2018); *see also North v. Cuyahoga Cty.*, 754 F. App'x 380, 392 (6th Cir. 2018) (holding that the inmate failed to show "the kind of widespread, gross deficiencies that would support a finding" of municipal liability).

Moreover, obligations under Rule 56 are not lessened for a *pro se* plaintiff. "The liberal treatment of pro se pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 U.S. App. LEXIS 27051, at *7 (6th Cir. May 5, 2010) (internal citations omitted). The Sixth Circuit has made it clear that, when opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status as a pro se litigant does not alter [this] duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming grant of summary judgment against a *pro se* plaintiff because he "failed to present any evidence to defeat the government's motion").

Because Plaintiff has failed to offer any evidence of custom or policy on the part of CCS, the Court finds that Plaintiff has failed to show a genuine issue of material fact as to CCS's corporate liability. The Court will, therefore, grant CCS's motion for summary judgment.

## IV. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that CCS's motion for summary judgment (DN 40) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment (DN 52) is **DENIED as moot**.

The Court will enter a separate Judgment dismissing this action for the reasons stated herein.

Date:   March 25, 2021

Rebecca Grady Jennings, District Judge
United States District Court

cc:     Plaintiff, *pro se*
        Counsel of record
A961.010